Good morning, your honors. Tracy Dreisboul, assistant federal public defender on behalf of Willie Evans. May it please the court. Mr. Evans has raised three issues in his brief. Unless the court directs me otherwise, I intend to spend most of my time today on the suppression issue. I would like to spend about a minute at the end on the sentencing unless there are any questions. It is black letter law that the Fourth Amendment draws a line at the front door. Whenever the police cross that threshold without a warrant, the government must overcome a presumption of illegality by showing facts proving that their search fell within a recognized exception to the warrant requirement. In this case, the government is proceeding under the emergency aid doctrine, which this court held in Holloway is a subset of exigent circumstances. Exigent circumstances requires proof of two elements, exigency and emergency aid. Probable cause may be satisfied by a reasonable belief that there was a person in the home in need of immediate aid such that a warrant cannot be reasonably obtained in time. However, that belief must still rise to the level of probable cause, and that, I believe, is the crux of this case. I know the court is familiar with the facts, but I think the timeline is important, so I'd just like to briefly review what was established at the evidentiary hearing. There were 9-1-1 calls. Now, the 9-1-1 calls were not entered into the hearing. The only testimony at the hearing about the 9-1-1 calls was that there was a single series of between two and five bullets fired. We don't know who the first officers on the scene were, because that's not in the record. The first officer to arrive who testified was Detective Cabrera, who arrived between three and four minutes after the 9-1-1 calls. I think we have to assume, because it would have been the government's burden to prove otherwise, that there was no chaos when they arrived. We don't have any evidence of blood spatter on the ground, broken glass, broken property, all these factors in other cases that have given rise to a finding of exigency. By the time Cabrera arrives, Misty Howard is already, I don't want to say detained in a legal sense, but she's being spoken to by between, I believe, four or five officers who are already on the scene. They're talking to her and her kids. It's unclear whether she was trying to leave and came back or was just leaving when the officers arrived, but we know she was on her way to bring her children to school. She tells them, she first of course denies to Detective Cabrera that she knows anything. She then admits, we had a fight, he went outside and fired some shots and then went back in the house. He asks her, Cabrera asks Misty Howard, who else is in the house? And she says, my boyfriend, Willie Evans. He, she then, he then asks her to get him out of the house. Now, the magistrate thought it was significant that he didn't come out for a period of time, but we know from Officer Aguirre's testimony that Willie Evans exited the house between seven and 10 minutes after the 911 calls. So there's not a huge amount of time here. Willie Evans comes out, he locks the door behind him. He is immediately, I don't know that the word immediately is in the transcript, but I think it can be inferred, cuffed, put in the back of the cop car and secured. The police try to open the house, find it is locked. They ask him, do you have a key? He says no. They ask him for consent to search. He says no. They ask him, is there anyone else in the house? He says no. At this time, he's having a, I think a detective Cabrera just got described it as somewhat collegial conversation with Cabrera in the police car. Officer Aguirre and some other officers go to the front of the house. This is when Officer Aguirre testifies that he heard a sound. He heard a crying or whimpering or something. And the, the radio transmission again is not in the record, but I think it can be found based on Cabrera's testimony. And I think also on Aguirre's testimony that he said, or something, because he uses that word. And then later on, um, defense counsel in cross-examining Cabrera says, and I read the CAD report, which is not an evidence. And it said he heard crying or something. And detective Cabrera says, yeah, or whimpering. Aguirre, Aguirre testified that he wasn't sure what he heard. He didn't know what it was. He wasn't sure if it was a human or a dog. Nonetheless, at that point in time, based on his report of what he heard, the decision was made to go in. Now at afterwards, after the decision has been made to go in is when Aguirre goes to test to talk to Misty Howard and says that she said she didn't know if there was anyone else in the house. Uh, to the extent that that, you know, factored into the magistrate's decision, the decision had already been made to go in at that time. But they hadn't gone in as of that time. Correct. I don't think they had gone in as of that time, but the decision had been made and there were also four spent case. They were your honor outside the house. And I think that's what's, that's what's significant because the court has to look at all the information known to the officers and what was known to the officers was a report of a single series of gunshots and all of the evidence the officers found when they arrived on the scene was consistent with a single series of gunshots being fired outside the house. There was no bullet hole on the threshold. There was no indication that, that a shot had been fired in toward the house and there was, there was no indication of any fight. Misty Howard wasn't bloody. She didn't look like she'd been in a fight. There was no blood on the ground. There were two small spots of blood inside the house, but the officers didn't know that when they went in. So the question becomes then was that probable cause? And it just wasn't, it was something, but it wasn't probable cause. What should the officers have done in that And they, they had many options to which they could have done that. They could have had any other of the, at least six officers on the scene, I believe the, the exact numbers and in the record, but it was at least five or six. And I think at least six, any other number of them could have stood by the door and seen if they heard it, they could have knocked on the door. And if no dogs barked, that might've indicated there weren't dogs in the house, right? Cause dogs usually bark. But if, but you know, if they, how would they be sure that it sounds like a silly question, but how could they be sure that it wasn't a human? Well, I, I don't know that. I don't know that they had to be sure, but I think they had to have probable cause to believe it was. And we know that nobody had a subjective belief that it was. So the question then is that a reasonable belief, a reason, does it rise to the level of probable cause? And it just doesn't. Do you think there's a 49% chance that there's a, you know, a toddler hiding in a closet? That's not enough to have exigent circumstances to go in there just to be sure. Well, I think that that would be probable cause because probable cause I don't think requires a 50%, you know, more likely than not. But, uh, you know, some, some lower chance of that. Don't you think it's reasonable if you, if you think that maybe there's a person in danger that the police can go in and bring that person to safety? Well, and I think the question becomes at, at, at what level of the belief is it? It would have to be a reasonable belief, right? Correct. Correct. And I just don't think it was reasonable in this case, particularly when they made no effort to find out what that was. And Gary testified, he had no idea what the sound was. Now, on the other hand, if it is a child in, in danger or need or, you know, in some bad circumstances, we might be concerned that the extra time that it would take to figure out whether it was a human or a dog might be critical. If we had any evidence that there had been a violent altercation in the house. And again, all the evidence in this case pointed to the fact that there was actually no evidence of the altercation. I want to, I'll get to that in a minute, but all the evidence in this case pointed to the fact that the shots had been fired outside. There was nothing to suggest anything had happened in the house. Now the government, a footnote 10 in their brief, they note that the district court discredited Misty Howard's testimony. And, and that's true to the extent that the magistrate found that both Mr. Evans and Ms. Howard had inconsistencies in their statements and were interested witnesses. And so he discredited their testimony in general. There was no specific finding with respect to whether they even asked about a dog. What is making that sound? They could have spent a minute having one other officer try to verify what he'd heard. They could have spent a minute having, you know, one officer asked Mr. Evans, do you have dogs? The fact of the matter is if it doesn't even rise to a subjective belief that there's a person in the house, I just don't think it can be an objectively reasonable entry. And we have to remember that the home is sacrosanct. The very few constitutional rights are given the right of the protection of the home. And the Supreme Court has repeatedly recognized that it's not just an individual right to the defendant, but it's a right that society protects because we cherish it into ourselves. And so particularly when we're talking about entry into a home, you need probable cause. And I just don't think that this particular sound in this case gave rise to probable cause, particularly when all of the evidence on the scene that had been corroborated by the 911 calls suggested that the four shell casings . . . What do you do about officers' testimony that Ms. Howard said, I don't know whether there's somebody in the house or not? That seemed to be very important. And she said, I never said that, that the magistrate judge discredited her as self-interest and for other inconsistencies. So the record leaves us not with just the noises, but she saying, I don't know whether there's somebody else in that house or not. And by the way, she had also lied at first saying nothing happened. And then she admitted, no, there were gunshots. And she claimed they were only outside. I don't know that they had to believe her that he really did it outside as opposed to into the house. So take those two things together. Particularly, she's just come out of the house. The neighbors called 911, so she didn't call 911. But she says, I don't know whether there's somebody in the house. Doesn't that give them probable cause? Well, let me . . . Along with hearing the sound. Let me break down the first part of the answers. I agree we're not challenging the magistrate's credibility findings. There were no objections. Those are what they are. But I still don't think it arises to probable cause in this circumstance because the four shell casings outside the house corroborated the 911 calls of a series of between two and five bullets. So we still don't have probable cause that anything was fired into the house. But if someone's behaving violently, couldn't they have taken other violent actions within the house? Or couldn't there simply be someone who's in danger inside the house? Your Honor, this court has repeatedly stated, and I cited a number of cases in my brief, Chavez and Santa off the top of my head, that that sort of speculation just isn't enough to overcome the warrant requirement. Without the whimpering, I agree with you. Without the sound, I think it's a much tougher case. But when there's been a violent situation and an officer hears crying or something, at that point, why don't they have probable cause to make sure no one else is in danger? Because at that point, the officer testified he had no idea what he heard, and he needed some level of corroboration to believe it was a human. It just didn't rise to the level of a belief that it was a human. I'm sorry. I know you wanted to get to your other argument, and I wanted to give you a chance to do that. Okay. Thank you, Your Honor. So the main argument I wanted to discuss is really just kind of the confusion in the record with respect to the guns. Because the indictment in this case, unlike many felon and possession cases, specifically identified four firearms. The factual basis of the... And by the way, only one of those firearms was a rifle. It was the muzzle light rifle and three pistols. The factual basis to the guilty plea and the PSI don't use the names of the firearms. They just say four firearms. Then there's this kind of confusion in the PSI, this one allegation, I think it's paragraph 10, where the government says that the rifle had an obliterated serial number and was able of a large capacity... Do you agree that we have to review this on plain error because this issue was not brought up before the district? Your Honor, even if it is reviewed for plain error, I mean, I do think there's enough. I was just overlooking, looking over the addendum to the PSI where counsel says, you know, he's talking about the pictures and the discovery and the evidence receipt. I think there's enough in the record that the government should have been on notice that there was confusion about the guns. But even if it is on plain error, I think the Supreme Court's recent cases and Molina-Martinez and Rosales-Morales make clear that any increase, any increase in the guidelines based on a guideline miscalculation would be prejudicial. And there's certainly precedent from this court that the government must meet a burden of proof of a preponderance of the evidence at sentencing. So I think there's a real problem when the only rifle ever identified in the case is and they're showing up with a Ruger with no explanation of how it got there and why, or more specifically, I did increase, I did submit the 20HA letter the other day because I think arguably if you take Cabrera's testimony in context, he's suggesting he got, he didn't expressly say he got it at Evans House, but I think the court could easily have inferred that reasonably. But he's still no explanation of why he's presenting the court with a Ruger when the indictment charged a wholly different gun. But is a muzzle light some kind of an attachment that you can put onto another gun? And so would it have maybe been accurate to, even though it was a Ruger gun, it had a muzzle light attachment? The problem, Your Honor, is that it was not what was specifically identified in the indictment. If this indictment had been a general indictment, a felon in possession and not identified four specific guns. And so what Mr. Evans pled to those four specific guns in this case. If we'd gone to trial, we may be having a constructive amendment problem. I think clearly we would be if we had gone to trial. But because he pled guilty and the guns weren't identified in the guilty plea, I think the court has to find he pled guilty to those four guns in the indictment. And then we show up at sentencing with something wholly different with no explanation. And so I just think to the extent the government has a burden of proof, they failed to meet it by failing to explain the discrepancy in this case. Thank you, counsel. Good morning. May it please the court. My name is Alejandra Lopez and I'm here on behalf of the United States. With me at counsel table is Jonathan Stratton, who prosecuted this case in district court. In this case, the district court did not err in denying the appellant's motion to suppress because there were exigent circumstances to enter his home without a warrant, where the police at the time in which they appeared at the appellant's home knew that there had been several 911 calls reporting gunshots, that one of those calls had stated that the gunshots came from a home with an orange car in the driveway. And when they appeared at the home, indeed, there was an orange car in the driveway, where police officers detained Misty Howard, who was visibly upset, who told officers at first that nothing had happened, there was no argument, there was no gunshots, and then admitted that she had argued with the defendant, excuse me, the appellant, and that he was suicidal and that he had shot a gun, where officers saw four casings, and where officers, when they spoke to Misty Howard and asked her if anyone else was inside, she was not sure. The defendant said no, but also said he didn't hear gunshots. And then, of course, where we hear the crying and the whimpering. Do you think that the officers could have gone in under that set of facts if you eliminated the whimpering? I think the record is clear that the officers, up until the point in which they hear the crying and the whimpering, are, as Officer Cabrera states in page 56 of Doctrine Entry I think at that point, they were being reasonable. They knew that this was a rapidly evolving situation. If you look at the timeline, Officer Aguirre, when he arrives, the defendant is about to come out of the house. When Officer Cabrera gets there, there are already officers there. All this happens within a very short five to ten minutes. And therefore, when they are trying to determine if there's anyone hurt or inside, it's only until they hear the crying or the whimpering that they decide that there is sufficient probable cause then to make the warrantless entry. I do believe that based on the testimony that was given, for example, there weren't a series of short, I think counsel referred to it as a series of gunshots or a series of 911 calls. The testimony was that there were several 911 calls that were reporting gunshots. So when officers arrived a very short time later, just like in Holloway, Aguirre within three to four minutes and Cabrera about the same amount of time, there are already officers present. Again, we don't know who the first officer present was, but there are already officers present. Misty Howard is already detained within those short three to five minutes. And in that time, they don't enter the house as soon as they get there. They don't even enter the house after they speak to Misty Howard and she says that the defendant is suicidal and he had shot a gun. They continue their investigation, ask him to have him come out, which he does. They question him about whether anyone else is inside and he tells them no, but also mentions that there are no gunshots. And Misty Howard, after initially denying everything, then admits that she does not know. Even if Misty Howard had said no, and she actually did in the beginning say that no one else was inside until she eventually admitted that her boyfriend was and that she didn't know if anyone else was. I don't think that would have changed anything at that point. They were still in a rapidly evolving situation trying to figure out whether or not there was anyone else inside who might have serious life-threatening injuries or might need help. And again, it's not until, as Officer Cabrera testified, he's in the front of their house. They're devising a plan to see if there is an emergency and Officer Aguirre goes to the east side of the house and hears the crying or whimpering. Now he admits that he doesn't know what's making the sound and when he radios it over the police radio frequency, there's an officer that actually tries to come through the back of the house to try and confirm what it is, but he's unable to because of the fence. And because they can't go past the fence, he's unable to go and investigate. Officer Cabrera says as soon as they hear that radio transmission, they are discussing what to do with the lieutenant and they decide we can't wait any longer. We need to make sure that there's no one with life-threatening injuries inside and so they make the entry. I believe when you look at the record, it was extremely reasonable for the officers to wait until that point. They didn't try to make entry before that time and they waited until they had the probable cause to enter given the rapidly evolving situation that occurred at the appellant's house and the information that was rather sketchy or vague from Misty Howard and the defendant. They were very reasonable in waiting to get all the information before they made entry. As to the issue that counsel raised in sentencing, the court is correct that this is a plain error standard. This was not raised before the district court and the government has to prove it with sufficient evidence when there's an objection made. And the court made very clear in page two of docket entry 58 that unless counsel raised any more issues beyond what was already in his objections to the PSI, he considered them waived. And defense attorney at the sentencing hearing did not raise that issue. They raised another issue about whether or not a partially obliterated serial number was sufficient for the enhancement. But I think the record is clear as the court notes the muzzle light is an aftermarket piece for firearms and the record is full of instances in which the court, while viewing the rifle itself and the government, when giving the rifle to the court, make mention that there's a metal portion of the firearm but that you have to remove the plastic casing aftermarket piece that is placed on the firearm. That's on page five of docket entry 58. The court obviously was able to view that. It then reviewed the fact that the Ruger rifle after the aftermarket piece had been removed, something Officer Kruber also testified to at the sentencing hearing. He reviewed the serial number and found that it was partially obliterated and therefore assessed that enhancement. As to the rest of the issues, unless there are any questions, I yield the rest of my time and I stand on my arguments and briefs. I actually have a small question. Did the word muzzle light, was that word ever spoken at the sentencing hearing? It was not. It is in the indictment, but it was not mentioned in the sentencing hearing only aftermarket piece or plastic aftermarket. Thank you. The government repeatedly referred to this as a rapidly evolving situation. I don't necessarily dispute that because it all did happen within a matter of ten minutes or so, but the one word that was not discussed in this case is chaos. That is a word that has occurred over and over and over in the exigent circumstances cases of both this court and the Supreme Court. There was no belligerent, no ongoing violent altercation. More importantly, there was no evidence of an actual person in the house. I did not find any case where the court has there was just no evidence that there was someone in the house. The fact that Mr. Evans was suicidal is obviously a non-issue because by the time the police went in, he was already detained in the police car. I wanted to point out that the sentencing issue was not waived. I don't think it was waived. It may not have been preserved exactly where we are making it now, but I would like to point the court to pages 19 and 20 of Mr. Evans' initial brief where we describe the addendum to the PSI and the very kind of lengthy objection that his counsel made regarding where are these firearms coming from. Again, no one explained, there's no evidence in the record that muzzle light is an aftermarket piece. I don't know that the court can just assume that that's common knowledge. It certainly was not explained in any way on the record in this case. Didn't one of the officers testify that this was the gun that he had taken from the closet? He did, Your Honor. He did, but he didn't explain why it was indicted as a muzzle light when they were talking about a Ruger. The other thing that stood out to me was that it appeared that Mr. Evans had an opportunity to actually see the firearm that we were talking about. They were shown to his counsel, yes, Your Honor. Neither his counsel nor Mr. Evans said anything about where is this firearm coming from or this wasn't mine or this wasn't in the house or anything of that nature. I think that's correct, Your Honor, at the sentencing hearing. Again, whether that was alluded to in the PSI objections, I can't really say. I do think that this may have been a situation where the lawyer didn't object in exactly the way the client would have wished, but what is on the record, you are correct, Your Honor. I did want to make one more point about the search. I think we are all in agreement that the key issue in this case is whether the crying or whimpering gave rise to probable cause. I just want to go back to Officer Aguirre's testimony that he had no idea what he heard. No idea is not, I thought there might be a child inside. The police admitted they were going in to make sure there was no one hurt, to make sure there were no other suspects in there. No one ever said, we believed there was someone in there who could be hurt. They were just trying to rule it out. The court has repeatedly refused to allow exigent circumstances to justify entering into the home on those facts. Thank you, counsel.